STATE OF NORTH CAROLINA v. THOMAS ALLEN O'KELLY, JR.

No. 891SC376

(Filed 1 May 1990)

1. **Searches and Seizures § 23 (NCI3d)— search of residence — search warrant — probable cause**

    There was probable cause to issue a warrant to search defendant's residence where Lt. Eck, who was in charge of the Dare County Sheriff's Dept. Narcotics Enforcement Unit, received a tip that one of defendant's neighbors suspected that a methamphetamine laboratory was being operated at defendant's residence and was afraid for the safety of herself and her child; Eck and other officers conducted a background check, communicated with other law enforcement agencies, and conducted a surveillance of defendant's residence; defendant had a prior drug conviction involving methamphetamine and Eck smelled an unusual chemical odor near the premises; a reliable confidential source who had been inside defendant's residence within the last two weeks said that defendant was making speed and stated that defendant would sometimes put some of his laboratory equipment in the trunk of his automobile; officers saw defendant removing bags and boxes from his car in the early hours of the morning; and consultation with an SBI agent specializing in clandestine laboratory investigations led Eck to believe that unusual hoses and electrical wiring could be signs of a clandestine laboratory. The totality of the circumstances presented to the magistrate at the time of the warrant application constituted substantial evidence from which a detached and neutral magistrate could find probable cause for believing that the fruits and instruments of criminal activity would be discovered in defendant's residence.

    **Am Jur 2d, Searches and Seizures §§ 68, 69.**

2. **Searches and Seizures § 23 (NCI3d) — narcotics — search of rented storage unit — probable cause for warrant**

    The facts in an affidavit supporting an application for a search warrant supported the magistrate's finding of probable cause to search a rented storage unit because a reasonably prudent person with the information that remnants of a clandestine drug laboratory had been found in defendant's

residence and that defendant had been seen putting parts of his laboratory in his automobile would be justified in believing that a storage unit rented by defendant would hold other parts of that laboratory, the chemicals used in producing the drugs, or the drugs themselves.

**Am Jur 2d, Searches and Seizures §§ 68, 69.**

3. **Searches and Seizures § 42 (NCI3d) — narcotics — search of residence pursuant to warrant — procedure for execution of warrant**

The trial court properly refused to suppress evidence seized pursuant to a search warrant on the grounds that the warrant was not read to defendant and that defendant was not given inventory of the items seized where two officers testified at the suppression hearing that the warrant was read to defendant, the trial court found that the officer in charge prepared an inventory of the seized items and mailed the inventory to defendant, who had been transferred at that point to Central Prison, defendant cites nothing to contradict the findings and conclusions, and the findings and conclusions were fully supported by the evidence. N.C.G.S. § 15A-252, N.C.G.S. § 15A-254.

**Am Jur 2d, Searches and Seizures §§ 83, 115.**

APPEAL by defendant from Order of *Judge James R. Strickland* entered 13 July 1988 and Order of *Judge Thomas S. Watts* entered 21 July 1988 in DARE County Superior Court. Heard in the Court of Appeals 15 November 1989.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Philip A. Telfer, for the State.*

*Aldridge, Seawell & Khoury, by G. Irvin Aldridge and Joe G. Adams, for defendant appellant.*

COZORT, Judge.

Defendant was indicted for possession with intent to manufacture a Schedule II controlled substance (amphetamine), manufacture of amphetamine, possession of more than the equivalent of 100 dosage units of amphetamine, possession of more than the equivalent of 100 dosage units of phenyl-2-propanone, possession with intent to sell and deliver cocaine, possession with intent to sell and deliver amphetamine, and maintaining a dwelling to keep a controlled

STATE v. O'KELLY

[98 N.C. App. 265 (1990)]

substance. The trial court denied defendant's motions to suppress evidence seized from searches of his residence and a rented storage unit. Reserving his right to appeal the court's rulings on his motions to suppress, defendant pled guilty to two counts of felonious possession of Schedule II controlled substance and one count of felonious maintaining of a dwelling to keep a controlled substance. Defendant appeals.

In his affidavit supporting his application for a search warrant, Lieutenant Robert Eck with the Dare County Sheriff's Department alleged the following in support of a finding of probable cause:

Lieutenant Eck had been a law enforcement officer for twelve years, had specialized training in conducting narcotics investigations, and had been involved in more than 300 narcotics investigations. He was currently in charge of the Dare County Sheriff's Department narcotics enforcement unit. On 23 March 1988, Eck received information from Charles Dail, a private investigator with "extensive law enforcement experience," that Patricia Bailey, who resided at Sea Retreat Cottages in Kitty Hawk, had informed Dail that defendant, a neighbor residing at Cottage 3 of the Sea Retreat Cottages, was operating a methamphetamine laboratory at his residence and that Bailey was afraid that the laboratory would ignite or explode and cause harm to her or her child. Eck conducted an investigation and surveillance of the area surrounding defendant's cottage. The investigation included an exchange of information among the Hanover County, Virginia, Sheriff's Office, the North Carolina SBI, and the Richmond, Virginia, Office of the DEA. Eck received information that the car parked in front of Cottage 3 was registered to defendant; that defendant had been convicted in Virginia for distribution of methamphetamine in December of 1979; that in November of 1986 "Crimestoppers" received information that defendant was manufacturing methamphetamine at his residence in Virginia; and that, in April of 1987, the SBI had received information that defendant was involved in the manufacture, sale, and distribution of methamphetamine and had moved from Virginia to Kill Devil Hills in Dare County, North Carolina. A description of defendant was obtained through Virginia DMV files.

The affidavit further alleged that, on 30 March 1988, Eck photographed the premises at Cottage 3. He noted an electrical wire running out of one window of the cottage and back into another, window shades and other non-transparent materials covering the

windows, an air conditioning unit, and a water hose outside the house. While near the premises, he smelled a "chemical odor not associated with usual household chemicals." On consulting with Special Agent Clark, a Special Services Coordinator for clandestine laboratory investigations for the State Bureau of Investigation, Eck was informed that his observations were consistent with the operation of a clandestine laboratory. In particular, Clark said that water and electricity are used in the illegal manufacture of methamphetamine, that window coverings are used to prevent visual observations and to keep chemical odors from escaping to the outside, and that air conditioners are used to provide ventilation.

Further surveillance conducted on 6 April 1988 showed a water hose running from underneath the house to a "Y" connector, with two hoses then running from the connector through a slightly opened window. A larger hose ran from the rear window of the house to the ground outside. Officers and agents observed defendant stand in the front door of the cottage, look around, exit the cottage, and walk around looking in all directions. This conduct was viewed by Special Agent Clark as being consistent with the paranoia associated with clandestine laboratory operators.

The following day, Patricia Bailey was seen leaving her cottage, entering defendant's cottage, and then returning to her own. That same day, Eck met with a "confidential, reliable source of information" who said that, sometime during the last two weeks, he had been in defendant's residence where he saw defendant cooking "speed" (the "street name" for methamphetamine), chemistry equipment (tubes, bottles, and beakers), and a container with "Meth—" written on it. This confidential informant also said that defendant would dismantle his lab when not using it and move the larger pieces to the trunk of his car. Special Agents informed Eck that vehicles and outbuildings are frequently used to store chemicals and equipment and that the chemical "methylamine" is commonly used in the illegal manufacture of methamphetamine.

On 7 April 1988, defendant was followed while driving his automobile from his residence and traveling northbound on Highway 158 toward Virginia. Surveillance was lost somewhere in Currituck County. That afternoon, a white male driving a vehicle registered to Warren Pemberton of Richmond, Virginia, and matching Pemberton's description was seen entering defendant's residence. A special agent from the Richmond DEA office informed investigating of-

ficers that the DEA had received information in 1981 from a confidential source that Pemberton was involved in the distribution of methamphetamine and marijuana in the Richmond area.

At 1:30 a.m. on 8 April 1988, defendant returned to his home and was seen exiting the cottage several times, retrieving a bag or container from his car, and reentering the cottage. Someone inside the house adjusted the windows and lights in the area where the lab was believed to be located. At 2:00 a.m. the window shades were closed and the lights turned off. At 3 a.m. a white male and a white female left the residence, and at 4 a.m. the porch light went out and defendant exited the cottage, walked down the side of the cottage in the rain and then went back inside. According to Special Agent Clark, clandestine laboratory operators operate their labs in the early morning hours to minimize detection. At 9 a.m. defendant stood at the front door of his residence looking outside. At 9:50 a.m. he went to his car, retrieved what looked like a tool box and reentered the cottage.

On the basis of the foregoing information contained in Eck's affidavit, the magistrate issued a warrant authorizing search of defendant's residence. As a result of the search, various items were seized, including methamphetamine, cocaine, marijuana, a "roach clip," a heating plate, $7,900.00 in bills of various denominations, a set of triple beam balance scales, white residue on various surfaces in the room, white hard crystalline substance in a plastic bag, and five pieces of "chemical glassware." Officers also found a lease for a storage unit at a "self-storage" facility in Nags Head.

A warrant for search of the storage unit was issued and executed on 8 April 1988. In his affidavit supporting issuance of that warrant, Eck referred to the first warrant and stated that, during the search conducted pursuant to the first warrant, officers and agents had discovered the storage lease and the "remnants of a clandestine laboratory used in the illegal manufacture of methamphetamine," along with approximately one ounce of cocaine, one ounce of methamphetamine and an undetermined amount of "P-2-P" (phenyl-2-propanone), identified as "a chemical precursor used in the illegal manufacture of methamphetamine." As a result of the search of the storage unit, officers seized a 500 ml. beaker containing white residue, a 500 ml. beaker containing brown and white residue, several flasks containing residue, a bag containing hot plates and water circulators, a bag containing clamps, ring-stands

and other laboratory items, a five-pound jar of sodium acetate, a bottle labeled phosphoric acid, "Red Devil" lye drain opener, two plastic bottles labeled sodium acetate, two sealed bottles containing 500 grams of phenylacetic acid, a glass jug containing 99% formamide, a glass bottle containing 99% acetic anhydride, and other items.

Defendant was arrested and indicted. He moved to suppress the evidence seized on grounds that no probable cause existed for issuance of the warrant and that the evidence seized was obtained as a result of substantial violations of Chapter 15A of the General Statutes, including failure of law enforcement officers to read the search warrant to defendant, inadequate return of service on the search warrant, failure to provide defendant with an inventory of the items seized, and failure to give defendant a copy of the search warrant. At the suppression hearing, Bailey testified that she had told Dail that something strange was going on at defendant's residence but that she did not say that she had seen a methamphetamine laboratory there, that she did not know what one looked like, and that she was afraid that defendant would believe that she had made such statements about him. Dail testified that he was a private investigator, that he had been fired from his position as Nags Head Chief of Police, and that Bailey had not specifically said "methamphetamine laboratory" but had mentioned "drugs," something being cooked, and a "strange odor" coming from defendant's residence, and had said she was afraid for the safety of her child. He also testified that Lieutenant Eck's affidavit "basically" conformed to the information he received from Bailey. Other evidence received from defendant at the hearing showed that the hose running from the window at the rear of the house was connected to a washing machine and that the electrical wire was connected to a clothes dryer. There was no evidence of anything unusual about the air conditioner or window shades.

[1] Defendant contends that there was no probable cause to issue a warrant for the search of his residence because the affidavit in support of the warrant was a recital of innocent and unprovocative details about defendant's actions and the appearance of his residence, contained stale references to defendant's past criminal activity, and failed to give underlying information demonstrating the reliability of Eck's sources. He further contends that the search of the storage unit was unlawful because it was based on evidence seized during the first illegal search and was, accordingly, the "fruit of the poisonous

tree," and, alternatively, that there was no independent probable cause justifying the search of the storage facility. We disagree.

Whether a search warrant should issue is controlled by the "totality of the circumstances" test, which has been described as follows:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*State v. Arrington*, 311 N.C. 633, 638, 319 S.E.2d 254, 257-58 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527, 548 (1983)). The reviewing court should give great deference to the magistrate's determination of probable cause and should not conduct a de novo review of the evidence to determine whether probable cause existed at the time the warrant was issued. *State v. Williams*, 319 N.C. 73, 81, 352 S.E.2d 428, 434 (1987).

While none of the pieces of information contained in Lieutenant Eck's first affidavit, standing alone, might give rise to probable cause for issuance of the warrant, the totality of the circumstances presented to the magistrate at the time of the warrant application constituted substantial evidence from which a detached and neutral magistrate could find probable cause for believing that the fruits and instruments of criminal activity would be discovered in defendant's residence. Eck had received a tip from Dail that Bailey, defendant's neighbor, suspected that a methamphetamine laboratory was being operated at defendant's residence and was afraid for her and her child's safety. Eck and other officers conducted a background check, communicated with other law enforcement agencies, and conducted a surveillance of defendant's residence. Defendant had a prior drug conviction involving methamphetamine. Eck smelled an unusual chemical odor near the premises. A reliable, confidential source who had been inside defendant's residence within the last two weeks said that defendant was making "speed" and stated that defendant would sometimes put some of his labora-

tory equipment in the trunk of his automobile. Officers saw defendant removing bags and boxes from his car in the early hours of the morning. Consultation with an SBI agent specializing in clandestine laboratory investigations led Eck to believe that the unusual hoses and electrical wiring could be signs of a clandestine laboratory. Giving due deference to the magistrate's determination, we hold that the totality of the circumstances set forth in the affidavit was sufficient to support the finding of probable cause.

[2]    We further hold that the facts set forth in the second affidavit supported the magistrate's finding of probable cause to search the storage unit. This Court has held that outbuildings can be searched when there is probable cause to believe that drugs are located in the main residence, see State v. Leonard, 87 N.C. App. 448, 454, 361 S.E.2d 397, 401 (1987), appeal dismissed and disc. review denied, 321 N.C. 746, 366 S.E.2d 867 (1988), and that there is probable cause to search a student's automobile located 100 yards from his dormitory even though drugs had been seen only in his dormitory room. State v. Mavrogianis, 57 N.C. App. 178, 291 S.E.2d 163, disc. review denied, 306 N.C. 562, 294 S.E.2d 227 (1982). We hold here that a reasonably prudent person with the information that "remnants" of a clandestine laboratory were found in defendant's residence and that defendant had been seen putting parts of his laboratory in his automobile would be justified in believing that a storage unit rented by defendant would hold other parts of that laboratory, the chemicals used in producing the drugs, or the drugs themselves.

[3]    Defendant next contends that, pursuant to N.C. Gen. Stat. § 15A-974, the evidence seized must be suppressed because (1) the warrant to search his residence was not read to him, in violation of N.C. Gen. Stat. § 15A-252, and (2) he was not given inventories of the items taken from his residence or the storage unit, in violation of N.C. Gen. Stat. § 15A-254. We find no merit to this contention. At the suppression hearing, both Officer Eck and Officer McLawhorn testified that Eck read the warrant to defendant. With respect to the inventory of defendant's residence, the trial court found that "Lt. Eck prepared an inventory of the seized items and mailed the inventory to the defendant by U.S. mail" and concluded that "Lt. Eck exercised due diligence in attempting to comply with the requirement that the defendant be supplied with the inventory of seized property." With respect to the inventory of the storage unit, the trial court found that

STATE v. O'KELLY

[98 N.C. App. 265 (1990)]

Eck undertook diligent and reasonable efforts to procure from the Kitty Hawk Police Department (a separate law enforcement agency not under control of Eck or his department but which had actual physical control of the items seized) a complete and accurate inventory of the items which had been taken from the B-104 storage unit; that the items seized had been stored with the Kitty Hawk Police Department for both safety and security reasons and Eck acted with proper dispatch to attempt to comply with the provisions of G.S. 15A-254 and 15A-257; that as soon as he received the written inventory from the Chief of the Kitty Hawk Police Department, Eck attached a copy of same to the original search warrant and returned it promptly to the magistrate on April 14, 1988, at 10:30 a.m.; that in addition thereto, Eck promptly and on the same day placed a copy of the inventory of seized items in the United States mail addressed to the Defendant who at that point had been transferred to Central Prison for safe keeping pursuant to an Order which appears of record in this court file; that such actions on the part of Eck substantially complied with the provisions of Article 11 of North Carolina General Statute 15A and the same do not constitute any ground or reason to exclude or suppress evidence seized as a result of the incident search.

The court concluded that the search warrant was executed and served in full accordance with Chapter 15A. Defendant cites nothing to contradict these findings and conclusions, which we find fully supported by the evidence. Accordingly, this assignment of error is overruled.

For the foregoing reasons, the orders below denying defendant's motions to suppress are

Affirmed.

Judges JOHNSON and LEWIS concur.